PROSKAUER ROSE LLP
Bernard M. Plum (BMP-4041)
Neil H. Abramson (NA-0889)
Michael J. Lebowich (ML-2307)
1585 Broadway
New York, New York 10036
(212) 969-3002
Attorneys for Plaintiff
The New York Times Company



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE NEW YORK TIMES COMPANY,

                Plaintiff,

      -against-

NEW YORK NEWSPAPER PRINTING PRESSMEN'S
UNION NO. 2; WILLIAM LOFTUS, as President of
NEW YORK NEWSPAPER PRINTING PRESSMEN'S
UNION NO. 2; ERIC SPOSITO, as Vice-President of
NEW YORK NEWSPAPER PRINTING PRESSMEN'S
UNION NO. 2; ROGER CARBO, as Secretary-Treasurer
of NEW YORK NEWSPAPER PRINTING
PRESSMEN'S UNION NO. 2; JAMES TITUS, as
Chapel Chairman of NEW YORK NEWSPAPER
PRINTING PRESSMEN'S UNION NO. 2; WILLIAM
MURDOCH, as New York Times College Point Facility
dayside Chapel Chairman of NEW YORK NEWSPAPER
PRINTING PRESSMEN'S UNION NO. 2; JAMES
LONG, as New York Times Edison Facility Nightside
Chapel Chairman of NEW YORK NEWSPAPER
PRINTING PRESSMEN'S UNION NO. 2; JACK
TIEDEMANN as New York Times Edison Facility Dayside
Chapel Chairman of NEW YORK NEWSPAPER
PRINTING PRESSMEN'S UNION NO. 2; and all others
in active concert or participation with them,

                Defendants.
-------------------------------------------------------------X

04 CV 9864
04 Civ. _____

**VERIFIED COMPLAINT**

       The New York Times Company, for its verified complaint against defendants,

alleges as follows:

## JURISDICTION

1. This action to enjoin job actions, work stoppages, work slowdowns and other acts that violate a collective bargaining agreement arises under Section 301(a) of the Labor Management Relations Act, 29 U.S C. 3185(a) ("Section 301"), pursuant to which this Court has jurisdiction and venue without regard to the amount involved or the parties' citizenship.

## THE PARTIES

2. Plaintiff The New York Times Company is a New York corporation engaged in the publication of a major daily newspaper known as "The New York Times" ("The Times"), with a principal place of business at 229 West 43rd Street, New York, New York.

3. The Times maintains manufacturing facilities and offices in New York City, College Point, Queens, and Edison, New Jersey, consisting of buildings, offices, machinery and equipment with a current market value well in excess of $25 million. The Times employs approximately 4,500 persons, and is engaged in an industry affecting commerce within the meaning of Section 301.

4. Upon information and belief, defendant New York Newspaper Printing Pressmen's Union No. 2 (the "Union") is an unincorporated association and labor organization with an office and place of business at 275 Seventh Avenue, New York, New York. The Union is the exclusive bargaining representative for certain employees employed by The Times at its College Point, New York and Edison, New Jersey printing plants. Said employees are in an industry affecting commerce within the meaning of Section 301.

2

5. Upon information and belief, defendant William Loftus is and at all relevant times has been President of the Union.

6. Upon information and belief, defendant Eric Sposito is and at all relevant times has been Vice-President of the Union.

7. Upon information and belief, defendant Roger Carbo is and at all relevant times has been Secretary-Treasurer of the Union.

8. Upon information and belief, defendant James Titus is and at all relevant times has been Chapel Chairman of the Union.

9. Upon information and belief, defendant William Murdoch is and at all relevant times has been New York Times College Point Facility dayside Chapel Chairman of the Union.

10. Upon information and belief, defendant James Long is and at all relevant times has been New York Times Edison Facility Nightside Chapel Chairman of the Union.

11. Upon information and belief, defendant Jack Tiedemann is and at all relevant times has been New York Times Edison Facility Dayside Chapel Chairman of the Union.

## THE COLLECTIVE BARGAINING AGREEMENT

12. The Times and the Union are, and at all times relevant hereto have been, parties to a collective bargaining agreement (the "Agreement") covering Times employees who are represented by the Union. The Agreement consists of a Memorandum of Agreement dated

3

August 17, 2004 and effective through March 30, 2017 and, to the extent not modified by or inconsistent with this most recent Memorandum, a contract booklet effective March 31, 1978 through March 30, 1984 and four other memoranda of agreement, effective March 31, 1984 through March 30, 1987; March 31, 1987 through March 30, 1993; March 31, 1993 through March 30, 2000, and March 31, 1997 through March 30, 2005, respectively.

13. Section 10 of the 1993 Memorandum of Agreement expressly prohibits strikes and/or any other concerted activities that interfere with the publication of newspapers:

### No Strikes/No Lockouts

A. There shall be no strikes (including, but not limited to, sympathy strikes), job actions, any acts honoring a picket line against the publisher or any of its wholesalers, news dealers, T-Route contractors, home delivery or vending machine dealers, or any other acts that interfere with the Publisher's operations or the production or sale of its products or services during the term of this Agreement by the Union, its officers, agents and members, or by the employees represented by the Union. The Union agrees that it will not authorize, ratify or condone any strike or any other activity described herein and further agrees that the Union, its officers and agents, will act as expeditiously as possible to do everything lawful within their power to prevent a violation of this provision and to stop a violation if it has occurred, including, but not limited to, immediately notifying members, officers and agents of the Union that conduct or anticipated conduct in violation of this provision is illegal and in violation of the Agreement.

B. The Publisher agrees that there will be no lockout of employees during the term of the Agreement.

C. Upon the failure of either party to comply with a decision, award or order of the Joint Conference Committee, the other party, after five (5) working days, shall be released from the "no strike-no lockout" provision as the case may be, provided that the party seeking release from this "no strike-no lockout provision" first obtains a determination from the issuing neutral tribunal that there has been no substantial compliance with the award and further provided that the non-complying party within that five (5) day period has not filed a motion, petition or other action to modify, clarify or vacate said decision, award or order. Notwithstanding the foregoing, a party shall not be released from the "no strike-no lockout" provisions until

five (5) days after the issuing neutral tribunal determines that there has been no substantial compliance. This five-day cure period shall in no way affect the parties' obligation to comply with the decision, award or order at issue. In the event that the non-compliance is cured within the five-day period there shall be no release from the "no strike-no lockout" provision.

14. The Agreement contains a mandatory grievance and arbitration procedure, which reads:

### JOINT CONFERENCE COMMITTEE

Section 41(a). A Joint Conference Committee of four (4) members shall be maintained. It shall consist of two (2) members selected by Publishers and two (2) members selected by the Union. A vacancy for any cause shall be filled immediately by the party in whose representation the vacancy occurs.

<u>To this committee shall be referred for settlement any dispute (except as provided otherwise herein) arising under this contract between a signatory Publisher and the Union if such dispute cannot be settled by conciliation between the Union and the Publisher involved.</u> A discharge case will be heard within 72 hours if so requested by the Union.

Any dispute arising under this Agreement which cannot be settled at the shop level is to be referred in writing to the Joint Conference Committee within sixty (60) days after the grieving party knew of the existence of the facts or circumstances giving rise to the dispute. In the absence of any excusing circumstances, any dispute not so referred shall be deemed to have been waived except to the extent that such dispute may be found to be a continuing dispute.

<u>Conditions prevailing prior to a dispute shall be maintained pending final decision.</u>

The committee shall meet within seven (7) days from the date on which any party signatory hereto raises an issue in writing and indicates that a meeting is desired, and shall proceed promptly to settle the dispute.

<u>If the committee reaches a decision, it shall be final and binding on all parties to the dispute.</u>

If the committee fails to reach an agreement within ten (10) days from the date on which the dispute is referred to it, the members of the committee shall select a fifth and impartial member to act as chairman. <u>The decision of the majority of this board of five shall be final and binding</u>; provided any decision on any issue shall not be retroactive to a date earlier than the date on which the issue is raised; provided, further, this board shall have jurisdiction only over

5

controversies properly and specifically referred to it, and its decisions cannot abridge the fundamental rights reserved by and to the signatory Publisher and the Union.

Should the four (4) members fail to agree on a chairman within seven (7) days the dispute may be submitted by either party to the American Arbitration Association for arbitration under its Voluntary Labor Arbitration Rules and procedures then pertaining.

Nothing herein obligates either party to arbitrate difference respecting a succeeding contract.

(b) <u>Incorporation of the Joint Conference Committee clause into this contract constitutes a mutually binding commitment to settle disputes and disagreements peacefully and without interruption of an orderly relationship between the parties or between employer and employee</u>. Negotiation, conciliation, and arbitration, if necessary, are set up as the only means to be used in adjusting differences. It is recognized that orders of a foreman must be followed fully and promptly, but if the Union charges that such orders are discriminatory or are outside the authority granted in the contract, then recourse to the Joint Conference Committee shall be prompt and procedure under the Joint Conference committee clause shall not be delayed. In consideration of such promptness and undelayed action, interpretation of the contract by chapel or Union officers in conflict with orders of the foreman is forbidden. <u>Thus, uninterrupted production and publication are guaranteed and immediate recourse to peaceable but binding grievance procedure is assured</u>.

(Emphasis added.)

## THE UNDERLYING DISPUTES AND UNLAWFUL SLOWDOWN

15. As described more fully below, the Union, last night and during the past week, has engaged in activities that violate the Agreement. In particular, the Union is engaged in activities that violate the no-strike/no-slowdown provisions contained in Section 10 of the 1993 Memorandum of Agreement. The Union's actions are also in derogation of the Union's contractual obligation (as set forth in Section 41(a) of the Agreement) to submit disputes concerning interpretation or application of the Agreement to arbitration. Section 41(a) requires the submission of grievances arising under the collective bargaining agreement to a Joint Conference Committee, which is a panel of Union and management representatives. If the Joint

6

Conference Committee is unable to reach a resolution, the matter is referred to final and binding arbitration.

16. As explained below, there are currently a number of pending arbitrable disputes between the parties that have raised tension levels at the College Point and Edison Plants. Last evening, however, a new major, arbitrable dispute came about. The Times prints what is referred to as a "double run daily," i.e., there are two separate runs each night on which we produce the Monday through Friday issues of the newspaper. During the first run of the evening, The Times prints the "soft" sections to be included in the following day's newspaper, including the Arts and World Business sections and the special sections of the newspaper that appear on specific days (for example, the Science Times on Tuesday, Dining In, Dining Out on Wednesday, etc.). The sections produced during the first run are referred to as "Part One." A second run ("Part Two") prints the "hard" news sections (International and National News, Metro Section, Sports, and Business). The production schedule is intended to allow for the latest possible newsroom "close" in order to include late-breaking news events and still ensure early morning delivery of the newspaper.

17. The two runs are later inserted together to make up the full daily newspaper. Newspapers produced for home delivery are bundled in separate parts, delivered to home delivery couriers throughout the evening, and put together by the home delivery couriers. Newspapers produced for sale at retail establishments are combined by The Times. As copies of Part One are produced, they are stored in what is known as the Mueller system. Then, when Part Two is printed, the two sections are integrated.

18. Each printing press is made up of ten separate printing "units." The number of units on a press used for a particular press run is based on the page size of the newspaper. Typically, the larger the newspaper, the more press units that will be used on a press run.

19. The number of units on a press run, in turn, determines the number of pressmen that are staffed on the press. Again, typically the more units that are used for a press run, the more men that are staffed on the press. The exact staffing levels are detailed in the parties' most recent Memorandum of Agreement.

20. The use of the double run daily results in two print runs of different sizes on a given night. For example, the early run may be a four (4) unit run, but the late run may be an eight (8) unit run. Since the inception of the double run daily, when this has occurred, the Times has staffed the presses for the entire night using the highest number of units that will be used that evening. This frequently results in unproductive overstaffing on the early run.

21. Last night, the early run was a six (6) unit run and the late run was an eight (8) unit run. For a six (6) unit run, a total of six (6) pressmen are needed for each press under the collective bargaining agreement, but for an eight (8) unit run, a total of eight (8) pressmen are needed on each press. The Times was running four presses last night at Edison and five presses at College Point. Thus, on the early run there were an extra eight (8) pressmen at Edison and an extra ten (10) pressmen at College Point above and beyond the required staffing levels.

22. Last night for the first time since the inception of the double run daily, The Times decided to utilize the extra pressmen at the Edison facility by operating a fifth press to print approximately 100,000 copies of the Sunday Travel section for the issue of Sunday,

8

December 19, 2004. This utilization of pressmen on more than two press crews was authorized in the most recent Agreement to increase flexibility in production. Upon learning of this decision, and as described in the accompanying declaration of Sal LaVecchia, the Union Chapel chairman voiced his protest to Mr. LaVecchia. Subsequently, the Union's counsel faxed a letter to Mr. Sabin grieving The Times' decision.

23. While the pressmen did successfully print the desired copies of the Travel section, the Union's protest took the form of intentional and concerted obstruction of the regular daily runs of the newspaper.

24. At approximately 9:30 p.m. last night, Jay Sabin, Vice President of Labor Relations of The New York Times, spoke with Union President William Loftus. Mr. Sabin stated that it was his understanding that both the Union's Chapel Chairman at Edison, James Long, and at College Point, James Titus, had spoken with Mr. LaVecchia earlier in the evening and that they had both complained about the printing of the Travel section. Mr. Sabin made it clear to Mr. Loftus that The Times expected the Union to abide by its contractual obligations and operate the presses that evening without incident. Mr. Loftus informed Mr. Sabin that he would contact Mssrs. Long and Titus.

25. At approximately 10:00 pm last night, Mr. Sabin spoke with Mr. Loftus again. During that conversation, Mr. Sabin informed Mr. Loftus that the press Mr. Long was working on had started its run extremely late. Mr. Loftus responded by telling Mr. Sabin that he had spoken with Mr. Long, and repeated that "if anything was going on, it's over now."

26. As detailed in the accompanying declarations, despite Mr. Loftus' assurances that any unlawful job action was "over now," production at both the Edison and

College Point facilities continued to experience unusual and inexplicable delays that severely impacted the production of the paper throughout the run last night.

27. In addition to this staffing dispute, there are currently a number of additional pending disputes, grievances and arbitrations which have raised tension levels between the parties in recent months and are fueling the Union's unlawful work stoppage:

28. a. There is an ongoing dispute concerning The Times' hiring of three (3) new Pressroom Foreman and informing the Union that it would be placing these foremen on its pressroom Priority List (i.e., seniority list). The Union has objected to the placement of these new foremen, all of whom were hired from other publishers, on the Priority List, *inter alia*, as a violation of the contract.

b. Issues also exist concerning The Times' plan to assign six (6) pressmen at the Edison facility to a press operator training session which occurred on Wednesday December 8, 2004 and as described in the Declaration of Sal LaVecchia.

29. The mandatory grievance-arbitration clause of the Agreement covers any dispute arising under the Agreement, including the disputes described above and in the accompanying affidavits. The Union's slowdown and job actions arise out of disputes that are arbitrable under the Agreement. The Times is ready and willing to discuss the Union's grievances and, if necessary, proceed to arbitration, but the Union has resorted to self-help.

30. The Union is engaging in the job action described above in order to pressure The Times to resolve a variety of disputes.

10

31. All of the above-mentioned acts have the effect of slowing down, causing The Times to be unable to print and ultimately deliver its paper to its customers at a time that customers need and expect.

32. The Times has requested that the Union cease said slowdowns and acts of sabotage, and resolve all disputes arising under the Agreement by arbitration under the Agreement. The Times has used every procedure available under the Agreement to resolve all arbitrable disputes without resort to federal court; but the Union has refused, and continues to refuse, to end its work slowdowns and stoppages and resolve the dispute through the arbitration procedure established and required by the Agreement.

## THE IRREPARABLE HARM RESULTING FROM THE SLOWDOWN

33. Upon information and belief, the unlawful acts referred to above were actually authorized or ratified by defendants and such acts will continue unless restrained by this court.

34. The Times' printing operation runs on an extremely tight production schedule. The Times' business is competitive with all forms of media that distribute news, including other companies publishing newspapers in the New York metropolitan area and elsewhere. Valuable goodwill, circulation and customer relationships have been developed by The Times over a period of years as a result of its prompt, efficient and satisfactory production and distribution of newspapers. Indeed, home delivery customers pay a premium for prompt early delivery of the newspaper.

3959/55553-216  NYLIB1/1732646v1

35. If defendants' activities are allowed to continue, The Times will suffer permanent and irreparable damage and injury in the form of lost goodwill, diminished customer confidence with regard to prompt and consistent newspaper delivery, possible permanent loss of advertisers, advertising agencies, distributors, subscribers, and newsstand and home delivery customers, diminished circulation, and loss of revenue and profit. The danger is particularly acute at this time of the year, because the period leading up to the Christmas holiday is typically the busiest period for newspaper advertising. Loss of circulation during this period is likely to have an especially harsh impact on good will among readers and advertisers.

36. Not all the damages caused by the Union's illegal conduct are susceptible of calculation, and the delays incident to obtaining such relief will result in serious and irreparable damage to The Times' business before such relief can be obtained. Indeed, the courts have recognized that shutdowns or delays in the publication and distribution of newspapers are especially likely to cause irreparable harm because of the potential loss of both circulation and goodwill among customers and advertisers. As one such court observed,

> Slowdowns in the production of a perishable product such as a newspaper may involve financial losses to the newspaper company to be sure, but the cost of late deliveries cannot be assuaged simply with money. The loss of goodwill among advertisers and readers may be incalculable.[1]

37. Endeavoring to recover damages from the Union would not prevent continuance or recurrence of the illegal acts and conduct.

---

1.  ──────────

[1] _Equal Employment Opportunity Comm'n v. The New York Times and N.Y. Newspaper Printing Pressmens' Union No. 2_, 53 F. Supp.2d 575, 584 (S.D.N.Y. 1998).

38. The Times has no adequate remedy at law and, unless a temporary restraining order is issued, will continue to suffer irreparable injury.

39. The Times will suffer more from the denial of an injunction than will the Union from its issuance; further, the Union will suffer no injury if a temporary restraining order and injunction are issued because the Union can seek relief through the parties' agreed-upon grievance-arbitration procedure under the Agreement.

40. The Times has complied with all obligations imposed by law that are involved in this labor dispute and has made every reasonable effort to settle this labor dispute by negotiation and voluntary arbitration.

41. The public officers charged with the duty to protect plaintiffs property are plainly unable to furnish adequate protection.

42. No prior application for the relief sought herein or for similar relief has been made.

WHEREFORE, The Times prays for judgment:

A. Granting plaintiff a temporary restraining order, and thereafter, a preliminary and permanent injunction, restraining and enjoining the Union, its officers, agents, representatives, employees, members and all those in active concert or participation with them or with any one of them who receive notice of the Order, from continuing, calling, threatening, instigating, directing, encouraging, causing, assisting or participating in any strike, work stoppage, slowdown, refusal to work as assigned, picketing or any other interruption in the normal and timely delivery of newspapers and/or in the operation of The Times, with respect to

any question, difference, dispute, complaint or grievance with The Times which is resolvable under the grievance and arbitration provisions of the collective bargaining agreement between The Times and the Union, including without limitation, the questions, differences, disputes, complaints or grievances currently at issue;

    B.    Directing the Union, its officers, agents, representatives, members, employees and all those in active concert or participation with them, or any of them, who receive actual notice of the Order, to advise all Times employees represented by the Union to cease engaging in any of the acts described in Paragraph A above, and to take all steps necessary to (i) advise all Times' employees represented by the Union of the existence and terms of this Order and (ii) ensure compliance by those employees with this Order, including but not limited to the imposition of Union discipline;

    C.    Directing defendants, together with plaintiff, to process in accordance with the parties' Agreement described herein and submit, if requested by the Union, any such grievance to arbitration, in accordance with the provisions of said Agreement;

    D.    Awarding to plaintiff the damages and lost revenue caused by defendants' unlawful activities;

14

E.  Granting such other and further relief to which plaintiff may be entitled under the circumstances, and disbursements incurred in this action, including attorneys' fees and costs.

PROSKAUER ROSE LLP

By *[signature]*

Bernard M. Plum (BMP-4041)
Neil H. Abramson (NA-0889)
Michael J. Lebowich (ML-2307)
Attorneys for Plaintiff
1585 Broadway
New York, NY 10036
(212) 969-3000

Dated: December 15, 2004
      New York, New York

VERIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

Jay Sabin, being duly sworn, deposes and says

1. I am Vice President of Labor Relations of The New York Times Company, plaintiff in this action.

2. I have read the foregoing Complaint and know the contents thereof to be true to the best of my knowledge, except as to matters stated to be alleged upon information and belief, and as to those matters I am informed and believe that they are true. My belief, as to those matters not stated upon knowledge, is based upon the books and records of The New York Times Company and conversations with employees and agents of The New York Times Company.

_____
Jay Sabin

Sworn to before me this
15th day of December, 2004.

_____
NOTARY PUBLIC

SHIRLEY E. ROACH
NOTARY PUBLIC, State of New York
No. 01RO4902441
Qualified in Kings County
Commission Expires Sept. 28, 2005